**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James Erin McKinney, | No. CV 03-774-PHX-DGC |
| Petitioner, | |
| | <u>DEATH PENALTY CASE</u> |
| vs. | |
| | **MEMORANDUM OF DECISION** |
| | **AND ORDER** |
| Charles L. Ryan, et al.,[1] | |
| Respondents. | |

Petitioner James Erin McKinney, a state prisoner under sentence of death, has filed a Corrected First Amended Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced in violation of the United States Constitution. Dkt. 42. The petition raises twenty-six claims for relief. In a prior order, the Court denied Petitioner's motion for evidentiary development, dismissed Claims 13-16 based on procedural bar, dismissed the Fifth Amendment aspect of Claim 11 as not cognizable, and denied Claims 10 and 12 on the merits. Dkt. 66. This order addresses the remaining claims and concludes, for the reasons set forth herein, that Petitioner is not entitled to habeas relief.

---

[1] Charles L. Ryan, Interim Director of the Arizona Department of Corrections, is substituted as Respondent pursuant to Federal Rule of Civil Procedure 25(d).

# BACKGROUND

In February and March of 1991, Petitioner and his step-brother, co-defendant Charles Michael Hedlund, embarked on a burglary spree.[2] While planning the crimes, Petitioner boasted that he would kill anyone who happened to be home during a burglary and Hedlund stated that anyone he found would be beaten in the head.

Petitioner and Hedlund enlisted two friends to provide information on burglary targets and to help with the crimes. The friends, Joe Lemon and Chris Morris, were not physically involved in the burglaries in which the murders occurred. It was from Lemon and Morris, however, that Petitioner and Hedlund learned that Christene Mertens would make a good target.

The first burglary occurred on February 28, 1991. Mertens's home was the intended target that night, but she came home and scared the four would-be burglars away. A different residence was chosen to burglarize, but the burglars obtained nothing of value.

The second and third burglaries occurred the next night, March 1. This time Lemon was not involved. The three participants stole a .22 revolver, a small amount of cash, some old pennies, a tool belt, and a Rolex watch.

The fourth burglary took place on March 9, 1991. This time only Petitioner and Hedlund were involved. The Mertens home was picked again because Petitioner and Hedlund had been told by Lemon and Morris, who knew Mertens's son, that Mertens kept several thousand dollars in an orange juice container in her refrigerator.

Mertens was home alone when Petitioner and Hedlund entered the residence and attacked her. She was beaten and stabbed. Finally, Petitioner held her face down on the floor and shot her in the back of the head, covering his pistol with a pillow to muffle the shot.

---

[2] Except where otherwise noted, this summary is based on the facts set forth by the Arizona Supreme Court in its consolidated opinion upholding Petitioner's and Hedlund's convictions. *State v. McKinney*, 185 Ariz. 567, 571-72, 580, 917 P.2d 1214, 1218-19, 1227 (1996).

Petitioner and Hedlund then ransacked the house and stole $120 in cash.

On March 17, 1991, Petitioner and Hedlund, accompanied by Lemon and Morris and their girlfriends, drove to a desert area outside of town. RT 10/28/92 at 74; RT 10/29/92 at 90.[3] There they encountered a party in a van to whom they unsuccessfully attempted to sell the pistol used to kill Mertens. RT 10/28/92 at 139-40. Subsequently, Hedlund wrapped the weapon and buried it in the ground. RT 10/29/92 at 95. Lemon and Morris observed Hedlund shooting his .22 rifle, which at that time was in its original, full-barreled condition. RT 10/28/92 at 86; RT 10/29/92 at 93. Morris testified that while in the desert on March 17 Hedlund told him that Petitioner had shot Mertens in the head. RT 11/2/92 at 7.

Petitioner and Hedlund committed the final burglary on March 22, 1991. The target was Jim McClain, a sixty-five-year-old retiree. McClain was targeted because Hedlund, who had bought a car from him some months earlier, thought McClain had money at his house. Petitioner and Hedlund entered McClain's home through an open window late at night. Hedlund brought along his .22 rifle, which by this point had been sawed-off to facilitate concealment. Petitioner and Hedlund ransacked the front of the house then moved to the bedroom. McClain was shot in the back of the head while he was sleeping. The bullet that killed him was consistent with being fired by Hedlund's rifle. RT 11/2/92 at 86-89. Petitioner and Hedlund then ransacked McClain's bedroom, taking a pocket watch, which officers ultimately located in a dresser in Hedlund's bedroom, and three hand guns. Petitioner and Hedlund also stole McClain's car, which was subsequently found partially submerged in a pond in the desert location where Hedlund had buried Petitioner's hand gun. RT 11/3/92 at 92, 97.

The next day, Petitioner and Hedlund attempted to sell the weapons taken from

---

[3] "RT" refers to the court reporter's transcript. "ROA" refers to the three-volume record on appeal on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court, Case. No. CR-93-362-AP. "ME" refers to the minute entries of the trial court. Certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court on January 27, 2005. Dkt. 58.

McClain as well as Hedlund's sawed-off rifle. All of the weapons were stored in the trunk of Hedlund's vehicle. A friend of Petitioner and Hedlund purchased McClain's weapons but not Hedlund's rifle, RT 11/2/92 at 46-47, which Hedlund then concealed in a closet at the residence where he was staying, RT 10/29/92 at 99. Officers subsequently located the weapon. RT 11/5/92 at 54-55. Analysis revealed a brown substance consistent with blood on the tip of the rifle. RT 11/4/92 at 56-57. Hedlund's fingerprints were on the weapon's magazine. RT 11/2/92 at 126. His finger and palm prints were also found on McClain's briefcase, which had been opened and rifled through during the robbery. *Id.* at 125-26.

Petitioner was tried with Hedlund before dual juries. On November 12, 1992, Petitioner was found guilty of two counts of first degree murder.[4] Maricopa County Superior Court Judge Steven D. Sheldon sentenced Petitioner to death. The Arizona Supreme Court affirmed the convictions and sentences. *State v. McKinney*, 185 Ariz. 567, 917 P.2d 1214 (1996). Petitioner filed a petition for post-conviction relief ("PCR"). Dkt. 47, Ex. B. The petition was denied without an evidentiary hearing. *Id.*, Ex. C. The Arizona Supreme Court summarily denied Petitioner's petition for review. *Id.*, Ex. E.

## APPLICABLE LAW

Because it was filed after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA). *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003). The following provisions of the AEDPA will guide the Court's consideration of Petitioner's claims.

### Principles of Exhaustion and Procedural Default

Under the AEDPA, a writ of habeas corpus cannot be granted unless the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982). To exhaust state

---

[4] Hedlund was convicted of second degree murder for the death of Mertens and first degree murder for the death of McClain.

remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based so that the state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). Unless the petitioner clearly alerts the state court that he is alleging a specific federal constitutional violation, he has not fairly presented the claim. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and post-conviction relief proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the

district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

Ordinarily, cause to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. at 753. Objective factors which constitute cause include interference by officials which makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for a claim was not reasonably available to counsel, and constitutionally ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). "Prejudice" is actual harm resulting from the alleged constitutional error or violation. *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). To establish prejudice resulting from a procedural default, a habeas petitioner bears the burden of showing not merely that the errors at his trial constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension. *United States v. Frady*, 456 U.S. 152, 170 (1982).

**Standard for Habeas Relief**

The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 1940 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly deferential

standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under the AEDPA is whether [a petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 76 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340; *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner

bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240. However, only the state court's factual findings, not its ultimate decision, are subject to 2254(e)(1)'s presumption of correctness. *Miller-El I*, 537 U.S. at 341-42. ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

## ANALYSIS

### Claims 1      Dual juries

Petitioner alleges that the use of dual juries violated his right to a fair trial. Dkt. 42 at 14. Respondents contend that the claim is procedurally barred because Petitioner failed to present the claim fairly in state court. Dkt. 46 at 42-44. Specifically, Respondents argue that Petitioner did not allege a federal constitutional violation, but relied on state rules, raised the claim only in a special action, and on appeal cited a "due process" violation based solely on the configuration of the courtroom. *Id.* The Court agrees that Claim 1 is unexhausted. The Court also find that the claim fails on the merits.

Background

Before trial, Judge Sheldon severed the cases because the prosecution intended to offer in evidence inculpatory statements made by each co-defendant that would be inadmissible against the other.[5] ME 3/18/92 at 6-8. Because virtually all of the other evidence appeared to be admissible against both Petitioner and Hedlund, however, the judge ordered that dual juries would be impaneled to hear the case. *Id.* Under Judge Sheldon's order, two juries would be selected from separate panels, each to hear the case against one of the defendants. *Id.* Both juries would be present in the courtroom except during the reading of charges, opening statements, closing arguments, and testimony related to a

---

[5] In *Bruton v. United States*, 391 U.S. 123, 136-37 (1968), the United States Supreme Court held that the admission into evidence of a co-defendant's confession violates the defendant's rights under the Confrontation Clause when the confession incriminates the defendant as well.

particular defendant's inculpatory statements. *Id.*

Petitioner filed a special action challenging the trial court's ruling. The court of appeals granted relief, relying on *State v. Lambright*, 138 Ariz. 63, 673 P.2d 1 (1983). *Hedlund v. Superior Court*, 171 Ariz. 566, 567-68, 832 P.2d 219, 220-21 (Ariz. Ct. App. 1992). *Lambright* had held that the use of dual juries was "improper" not on constitutional grounds but because it represented the adoption of "a local rule 'unauthorized by this court.'" *Hedlund v. Sheldon*, 173 Ariz. 143, 145, 840 P.2d 1008, 1019 (1992) (quoting *Lambright*, 138 Ariz. at 69, 673 P.2d at 7)).

The Arizona Supreme Court reversed, holding that a trial court has the discretion to adopt specialized procedures such as impaneling dual juries "[a]s long as such procedures are not inconsistent with applicable constitutional and statutory procedures, as well as our rules of court." *Id.* at 146, 840 P.2d at 1011 (1992). The court held that the *Lambright* decision had gone "too far" and that the "decision to impanel a dual jury is not a local rule . . . [or] a rule of procedure at all." *Id.* at 146, 840 P.2d at 1011. Finally, the court approved the dual jury procedures put in place by Judge Sheldon for Petitioner's trial. *Id.*

On direct appeal, Petitioner argued that the "courtroom layout" resulted in "fundamental error." Dkt. 47, Ex. A at 7. According to Petitioner, "[o]ne of the problems with dual jury process was courtroom logistics," which resulted in an overcrowded room with the jury seated in close proximity to, and facing, the defendants. *Id.* The claim alleged that this "bizarre and prejudicial seating arrangement deprived [Petitioner] of due process under the Arizona and Federal Constitutions." *Id.* at 9. The Supreme Court rejected Petitioner's argument, explaining that it "decline[d] to invent" a "constitutional right to a standard American courtroom." *McKinney*, 185 Ariz. at 585, 917 P.2d at 1232.

In his PCR petition, Petitioner again challenged the courtroom's seating arrangement. Dkt. 47, Ex. B at 5, 36. He also alleged that the dual jury process "violated his right to a fundamentally fair trial" by causing confusion, anxiety, speculation, and physical unease among the jurors. *Id.* at 33-34. The claim cited no provisions of the United States

Constitution. The PCR court found that Petitioner had failed to raise a colorable issue. Dkt. 47, Ex. C at 13.

Analysis

Petitioner identifies several categories of prejudice allegedly caused by the use of dual juries. Dkt. 42 at 17-20; Dkt. 59 at 33-35. He asserts that use of dual juries was prejudicial because he and Hedlund presented antagonistic defenses. In addition, according to Petitioner, the presence of two juries limited cross-examination and led to confusing testimony and improper attributions of guilt. He also argues that the dual trial provided a basis for the use of physical restraints and other security measures. Finally, he asserts that the dual jury process necessitated the prejudicial configuration of the courtroom. As set forth above, the last of these allegations is the only dual jury claim that Petitioner arguably exhausted in state court. Neither it nor the remaining allegations entitles Petitioner to relief.

In *Lambright v. Stewart*, 191 F.3d 1181, 1187 (9th Cir. 1999) (en banc), the Ninth Circuit held "there is no per se constitutional error in the use of dual juries." Other courts have reached the same conclusion. *See, e.g.*, *Wilson v. Sirmons*, 536 F.3d 1064, 1098-1100 (10th Cir. 2008) (use of dual juries during capital defendant's trial with co-defendant did not violate his rights under the Sixth, Eighth, and Fourteenth Amendments); *United States v. Lewis*, 716 F.2d 16, 19 (D.C. Cir. 1983) ("We accept the dual jury procedure so long as it comports with the ethos of due process commanded by our stringent rules of criminal justice."). To be entitled to relief on this claim, Petitioner must show that the use of dual juries resulted in a specific due process violation. *See Lambright*, 191 F.3d at 1187 (relief denied where petitioner failed to identify any due process or "other specific trial right" compromised by the use of dual juries); *United States v. Hayes*, 676 F.2d 1359, 1366 (11th Cir. 1982) (rejecting challenge to the use of multiple juries and noting that "neither [defendant] has alleged any more than a generalized possibility of harm"); *Mack v. Peters*, 80 F.3d 230, 235 (7th Cir. 1996) ("For [a dual jury] trial to be unconstitutional, a defendant tried in such a trial must show some specific, undue prejudice.").

To the extent that Hedlund and Petitioner offered antagonistic defenses or potential *Bruton* problems arose, the use of dual juries actually prevented prejudice. When appropriate, the co-defendant's jury was excused, having previously been instructed to consider only the evidence presented in court and not to speculate on the evidence presented to the other jury. RT 10/13/92 at 73; *see* ME 3/18/92. For example, Hedlund's jury was excused during the testimony of Petitioner's father, who recounted a conversation with Petitioner that implicated both Hedlund and Petitioner. RT 11/4/92 at 3-41; *see* RT 11/5/92 at 5-32. Similarly, Petitioner's jury was excused when Chris Morris testified about Hedlund's statement that Petitioner had shot Ms. Mertens. RT 11/2/92 at 5-10. Opening statements and closing arguments were made separately. *See* RT 10/20/92 at 14; RT 11/10/92 at 22. In these instances, "dual juries help[ed] assure . . . compartmentalization by keeping dangerous evidence away from the ears of the jurors for the defendant to whom it does not apply." *Lambright*, 191 F.3d at 1186.

The only specific example of prejudice Petitioner cites is testimony regarding an additional burglary elicited during the cross-examination of Chris Morris by Hedlund's counsel. Dkt. 42 at 19. On redirect, the prosecutor elicited testimony from Morris that after the burglary Petitioner stated that he would have shot the resident if he had been home. RT 10/29/92 at 178. This testimony, which would have been admissible against Petitioner notwithstanding the use of dual juries, was cumulative to Morris's testimony on direct examination that Petitioner stated he would shoot anyone present in the homes they were burglarizing. RT 10/29/92 at 65.

Petitioner offers no additional support for his allegation that his ability to cross-examine witnesses was impermissibly limited by the use of dual juries. He has thus failed to show a specific due process violation. *See Wilson*, 536 F.3d at 1100 (petitioner failed to "identif[y] any specific information that might have been, but was not, elicited from a proper cross-examination of any witnesses"); *Brown v. Sirmons*, 515 F.3d 1072, 1078-79 (10th Cir. 2008) (dual jury imposes burdens on defense counsel but relief not warranted in absence of

"specific instances" of prejudice).

As the Arizona Supreme Court held, there is no support for Petitioner's contention that his due process rights were violated by the configuration of the courtroom. Petitioner cites no clearly established federal law in support of his argument. Finally, as explained below, this Court has determined that the use of leg braces did not amount to a constitutional violation.

In *Lambright*, the Ninth Circuit noted that even in a joint trial before a single jury, where the potential dangers due to antagonistic defenses and evidence overlap are not addressed as directly as during a trial before dual juries, a defendant "must establish that the prejudice he suffered from the joint trial was so 'clear, manifest or undue' that he was denied a fair trial.'" *Lambright*, 191 F.3d at 1186 (quoting *United States v. Throckmorton,* 87 F.3d 1069, 1071-72 (9th Cir. 1996)). For the reasons set forth above, Petitioner has failed to make that showing.

The decision of the Arizona Supreme Court was neither contrary to nor an unreasonable application of clearly established federal law. Claim 1 is denied.

**Claim 2      Denial of severance**

Petitioner alleges that the trial court violated his rights by denying his severance motion. Dkt. 42 at 21. Respondents contend that the claim is barred. Dkt. 46 at 49. The Court agrees.

Petitioner did not raise this claim on direct appeal. In his PCR petition, he alleged that the joint trial violated his rights under the Fifth, Sixth, and Fourteenth Amendments. Dkt. 47, Ex. B at 5, 34. The PCR court found the claim "precluded" because Petitioner "clearly could have raised this issue on appeal." *Id.*, Ex. C at 13. The court's determination that the claim had been waived, *see* Ariz. R. Crim. P. 32.2(a)(3), constitutes an adequate state procedural bar. *See Smith*, 536 U.S. at 860; *Ortiz*, 149 F.3d at 931-32. Petitioner does not attempt to demonstrate cause and prejudice or a fundamental miscarriage of justice to excuse the default. Consequently, federal habeas review of this claim is barred. Moreover, the claim

is without merit for the reasons discussed above. Claim 2 is denied.

**Claim 3        Confrontation Clause violation**

Petitioner alleges that his Confrontation Clause rights were violated when the trial court refused to allow defense counsel to question a witness about his juvenile record. Dkt. 42 at 22. Respondents concede that the claim is exhausted. Dkt. 46 at 52.

Background

Joe Lemon was called as one of the State's witnesses. After Lemon provided some preliminary testimony, a brief recess was called and a hearing conducted out of the jury's presence to determine if Lemon could be impeached with his juvenile record. RT 10/28/92 at 77. Petitioner's counsel questioned Lemon. *Id.* Lemon had previously been interviewed by defense counsel, and no evidence of any juvenile adjudications ever surfaced. *Id.* at 14-15. The prosecutor told the defense attorneys that Lemon had no juvenile convictions, but defense counsel wanted to question him again. *Id.*

Lemon testified during the hearing that he had been charged as a juvenile for aggravated assault. RT 10/28/92 at 79. He indicated that he had appeared before a judge on the charge, but never had a hearing where witnesses were called, never pleaded guilty, and had not been adjudicated – he was placed under house arrest for two weeks. *Id.* at 78-83. At the conclusion of the defense examination and the State's cross-examination of Lemon, no evidence of any adjudication had been presented. Thus, the judge determined that under Rule 609 of the Arizona Rules of Evidence Lemon could not be impeached with his juvenile record.[6] *Id.* at 83.

---

[6]        Arizona Rule of Evidence 609 provides, in relevant part:

(a) General rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record, if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect, and if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was

- 14 -

When testimony resumed before the jury, defense counsel on cross-examination asked Lemon if he was receiving any benefit from the prosecution in exchange for his testimony. Lemon answered that he was not. RT 10/28/92 at 106.

On direct appeal, the Arizona Supreme Court rejected the claim, raised by both Petitioner and Hedlund, that the refusal to permit questioning of Lemon on juvenile convictions constituted a denial of the right to confrontation:

> Hedlund argues that his right to confrontation is paramount to the state's interest in protecting Lemon as a juvenile offender-witness. *See Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *State v. McDaniel*, 127 Ariz. 13, 617 P.2d 1129 (1980). In the abstract we agree with Hedlund's proposition, but we find his argument inapplicable to the facts of his case because Hedlund and his lawyer were present when Lemon testified and the lawyer was permitted to and did examine Lemon.
>
> . . . Hedlund . . . has never proffered any evidence to show that Lemon had *any* juvenile adjudication, let alone one with which he could have been impeached. Indeed, as late as oral arguments in this court, Hedlund's counsel possessed no evidence that Lemon had ever been adjudicated as a juvenile. Furthermore, Lemon was not an accomplice in the crimes, was never charged, and was never offered immunity for his testimony. He was eighteen years old at trial and therefore could not have been on juvenile probation at the time of the trial. *See* Ariz. Const. art. VI, § 15. In sum, Hedlund fails to demonstrate how Lemon's juvenile record could have been used for anything other than a general attack on his character. *See State v. Morales,* 120 Ariz. 517, 520-21, 587 P.2d 236, 239-40 (1978); *cf. McDaniel,* 127 Ariz. at 15-16, 617 P.2d at 1131-32.

*McKinney*, 185 Ariz. at 574, 917 P.2d at 1221; *see id.* at 585, 917 P.2d at 1232.

Analysis

State law matters, including a trial court's evidentiary rulings, are generally not proper

---

convicted or (2) involved dishonesty or false statement, regardless of the punishment.

. . . .

(d) Juvenile adjudications. Evidence of juvenile adjudication is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.

- 15 -

grounds for habeas corpus relief. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) (internal quotation omitted); *see Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir. 1991). Therefore, a violation of Rule 609 cannot, by itself, furnish a basis for habeas relief.

The right to confront witnesses includes the right to cross-examine adverse witnesses to attack their general credibility or show possible bias or self-interest. *Olden v. Kentucky,* 488 U.S. 227, 231 (1988) (per curiam); *Delaware v. Van Arsdall,* 475 U.S. 673, 678-79 (1986); *Davis v. Alaska,* 415 U.S. 308, 316 (1973). "The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Thus, "judges retain wide latitude insofar as the Confrontation Clause is concerned" and may impose limitations on cross-examination that are "reasonable" and are not "arbitrary or disproportionate to the purposes they are designed to serve." *Van Arsdall*, 475 U.S. at 679.

A Confrontation Clause violation occurs where the defendant is prevented from investigating "a prototypical form of bias" and "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680. Because improper denial of the opportunity to impeach a witness for bias is subject to a harmless-error analysis, *id.* at 684, a petitioner is not entitled to relief unless he can establish that the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). To determine if the error was harmless, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684.

- 16 -

A review of *Davis* is sufficient to establish that the Arizona Supreme Court did not unreasonably apply clearly established federal law in rejecting Petitioner's allegation of a Confrontation Clause violation. *Davis* involved a burglary in which a safe was taken from a bar. 415 U.S. at 309. The only eyewitness was a sixteen-year-old who claimed to have seen the defendants near his house with a crowbar. The safe was recovered near the juvenile witness's house. *Id.* at 310. The witness was on probation for burglary himself, a fact which defense counsel wanted to explore on cross-examination as a means of showing possible bias. *Id.* at 311. The trial court precluded impeachment on the issue because it conflicted with the state's interest in preserving the confidentiality of juvenile adjudications. *Id.* The Supreme Court reversed, holding that the "accuracy and truthfulness of [the witness's] testimony were key elements in the State's case against petitioner" and that the defense claim of bias was "admissible to afford a basis for an inference of undue pressure" based on the witness's "vulnerable status as a probationer" and his "possible concern that he might be a suspect in the investigation." *Id.* at 317-18. The Court also noted that the witness, in answering the questions defense counsel was allowed to ask, provided misleading testimony about his background and involvement in the case. *Id.* at 313-14.

In Petitioner's case, there was no showing that Lemon had a juvenile adjudication, and defense counsel's failure to make an offer of proof on the matter supported the judge's limitation of the cross-examination. *See DiBenedetto v. Hall*, 272 F.3d 1, 10-11 (1st Cir. 2001) (court may circumscribe cross-examination if the party is unable to lay a proper evidentiary framework); *Bui v. DiPaolo*, 170 F.3d 232, 243-46 (1st Cir. 1999) ("One well-established basis for circumscribing cross-examination is a party's inability to lay a proper evidentiary foundation for the questions he wishes to pose"); *Jones v. Berry*, 880 F.2d 670, 674-75 (2d Cir. 1989) (no violation where the record suggested no information which continued questioning would have exposed and counsel failed to make an offer of proof).

Therefore, in contrast to the situation in *Davis*, the desire of Petitioner's counsel to elicit testimony about Lemon's involvement in the juvenile system could have been used for nothing but a general character attack. As the Arizona Supreme Court noted, Lemon was not

an accomplice in Petitioner's crimes; he was never charged and was not offered immunity for his testimony. *McKinney*, 185 Ariz. at 574, 917 P.2d at 1221. Thus, the proposed cross-examination did not constitute an otherwise appropriate effort to impeach Lemon's credibility or explore a prototypical form of bias such as a plea agreement, a reduced sentence, or other "ulterior motives of the witness." *Davis*, 415 U.S. at 316; *see Olden*, 488 US at 231 (Confrontation Clause violation occurred when the trial court excluded cross-examination regarding evidence that the complainant in a sexual misconduct trial was living with the prosecution's key witness at the time of trial and thus had a motive to lie in order to protect her current relationship); *Van Arsdall*, 475 U.S. at 680 (violation where the trial court barred any cross-examination concerning a plea deal by which criminal charges against the witness were dropped in exchange for his promise to speak with the prosecutor about the murder charge against the defendant). Finally, unlike the situation in *Davis*, Lemon was not the State's key witness against Petitioner. Morris also provided important testimony, and circumstantial evidence clearly linked Petitioner to the crimes.

Petitioner has not shown that the trial court's exclusion of testimony regarding Lemon's juvenile record had a substantial, injurious impact on the jury's verdict. *Brecht*, 507 U.S. at 637. Petitioner is not entitled to relief on Claim 3.

**Claim 4        Use of restraints at trial**

Petitioner alleges that his right to a fair trial under the Sixth and Fourteenth Amendments was violated because he was shackled throughout his trial, in view of the jurors, without a sufficient justification for the restraints. Dkt. 42 at 28. Respondents contend that the claim is unexhausted and procedurally barred. Dkt. 46 at 57.

Respondents correctly note that Petitioner did not properly exhaust this claim by presenting it in state court on appeal or during his post-conviction proceedings. Petitioner contends that the claim was exhausted by the Arizona Supreme Court's fundamental error review. Dkt. 59 at 3-6. The Court rejects this argument. *See Moormann v. Schriro*, 426 F.3d 1044, 1057 (9th Cir. 2005); *Poland (Michael) v. Stewart*, 117 F.3d 1094, 1105 (9th Cir. 1997); *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996). Petitioner further

contends that the claim was exhausted because it was raised by co-defendant Hedlund and considered by the Arizona Supreme Court in its consolidated opinion. *Id.* at 2. According to Petitioner, therefore, the claim was fairly presented in state court and it would be "futile" to raise it again. *Id.* at 2, 15-16.

In *Williams v. Nelson*, 431 F.2d 932, 932-33 (9th Cir. 1970), the Ninth Circuit held that exhaustion of state court remedies may not be accomplished vicariously on direct appeal through a co-defendant, even if the appeals are consolidated. *See, e.g.*, *Lee v. McDaniel*, No. 3:05-CV-378, 2008 WL 2228652 (D.Nev. May 28, 2008). Other courts appear to have reached a different conclusion. *See United States ex rel. Cunningham v. DeRobertis*, 719 F.2d 892, 894-95 (7th Cir. 1983) (excusing non-exhaustion on the grounds that the state courts rejected an identical claim made by the petitioner's co-defendant and stating that "the issue . . . has been exhausted – albeit not by petitioner [because the] issue has been squarely presented to – and rejected by – the [state courts]. No federalism purpose would be served by requiring petitioner personally to raise the issue again"); *see also Fisher v. Texas*, 169 F.3d 295, 303 (5th Cir. 1999) ("The futility exception [to the exhaustion requirement] applies when . . . the highest state court has recently decided the same legal question adversely to the petitioner"); *Allen v. Attorney General*, 80 F.3d 569, 572-73 (1st Cir. 1996) (finding a claim exhausted because the state's highest court had recently rejected identical claim).

The Court has determined that it is unnecessary to resolve this seeming conflict in authority applicable to the procedural status of Claim 4. Instead, for the reasons set forth below, the Court will deny the claim as meritless. *See* 28 U.S.C. § 2254(b)(2) (allowing denial of unexhausted claims on the merits); *Rhines v. Weber,* 544 U.S. 269, 277 (2005) (a stay is inappropriate in federal court to allow claims to be raised in state court if they are subject to dismissal under (b)(2) as "plainly meritless").

Background

Petitioner and Hedlund were each required to wear a leg brace during trial as a security measure. The brace was worn beneath the pant leg, but apparently was visible at the

ankle if the pant leg was raised.[7]  *See* RT 10/13/92 at 41; RT 3/19/93 at 55-58.  Because the brace caused them to walk with a stiff gait, Petitioner and Hedlund were seated when the jury entered and exited the courtroom.  *See* RT 10/15/92 at 15-16.

At a pretrial hearing, Petitioner's counsel objected to the configuration of the courtroom, complaining the leg brace would be visible to the jurors because the jury box was located directly across from the defense table.  RT 10/13/92 at 6.  The court asked the prosecutor to make a record regarding the basis for restraining the defendants.  *Id.* at 22.  The prosecution called as its sole witness deputy sheriff Jack Lane.  Sergeant Lane testified that in March 1992 an inmate had reported to a corrections officer that he, the inmate, had overheard Petitioner and another inmate, a murder suspect (presumably Hedlund), discussing an escape plan in which they would jump a guard, handcuff him and take his weapon and uniform, and walk away from the jail.  *Id.* at 43-44.  Lane also testified that as a matter of policy all homicide defendants were placed in leg braces when appearing in court.  *Id.* at 44.  He further testified that, along with the violent nature of the offenses with which Petitioner and Hedlund were charged, the use of dual juries and the presence in the courtroom of a large number of family members of the victims presented additional security concerns necessitating the use of the leg braces.  *Id.* at 44-45.  During this testimony, the prosecutor questioned Lane about an alleged escape attempt by Petitioner in 1991; Lane was unable to confirm the information.  *Id.* at 48-49.

The court subsequently explained that its ruling was not based on the sheriff department's policy of shackling inmates accused of violent crimes, explaining that the policy itself, without consideration of its application to specific circumstances, is "entitled to no weight."  RT 10/15/92 at 9.  The court stated, however, that:

> Given the fact of the nature of these charges – obviously the presumption of innocence arises, I cannot presume that your clients are guilty of these charges – I think it would be irresponsible for the trial judge to close his eyes against

---

[7]  According to the judge, "if they keep their pant leg down . . . it looks like maybe they have a leg brace on for some deformity or handicap."  RT 10/13/92 at 41.

the charges brought against the defendant in a courtroom in close proximity to jurors and staff and others who may present a real risk of harm or threat to them.

*Id.* at 11.

The court then found, referring to Sergeant Lane's testimony, that additional security concerns supported the use of the leg brace:

I have been provided with what I have weighed and considered as reasonably reliable evidence that there is indeed a real escape risk in this case; perhaps not in the courtroom, but one that has been articulated outside of the hearing of the Court in a fashion that indicates that both defendants were anticipated to involved in it.

*Id.*

Next, the court noted that the original defense tables had been replaced with tables that had "a front to them that drops down approximately two of the four feet" and therefore the leg braces were "not as obvious" as they had been before. *Id.* at 13.

The court concluded by stating that it had "evaluated" all of the information and determined that the use of leg braces "is clearly called for in this case. And I have considered other alternatives and concluded that that is required and is not unduly prejudicial to your clients' right to present a defense." *Id.* at 13-14.

During trial Petitioner joined in Hedlund's motion objecting to the configuration of the courtroom and use of the leg brace. ROA 66. Hedlund again raised the issue in a motion for a new trial, arguing that the security concerns used to justify use of leg braces were not well founded and that due to the arrangement of the jury box and defense tables the jurors were able to see the braces. *Id.* In response to the motion, and out of concern that photos provided by the defense investigator inaccurately depicted the defense tables and the layout of the courtroom, the court set an evidentiary hearing to hear testimony from Richard Morris, a detention officer who was present in the courtroom throughout Petitioner's trial. RT 3/19/93 at 5-6. Morris testified that the angle at which certain photos were taken, along with the lighting provided by the camera's flash, tended to make the underside of the defense table more visible than it was to the naked eye from the jurors' perspective at trial. *Id.* at 58, 67-68, 73-74. The defendants presented testimony from their investigator, who spoke with three

of the jurors after the trial. RT 3/30/93 at 47-54. The jurors informed the investigator that they had viewed the leg brace and discussed the issue with other jurors; that given the seriousness of the charges they were not surprised that such a security measure was used; and that seeing the defendants in braces had no effect on the verdict. *Id.*

In its order denying Petitioner's motion for a new trial, the court reiterated that the use of leg braces was an appropriate response to the security concerns presented by the defendants. ME 7/2/93. The court further explained: "The evidence introduced at the hearing clearly demonstrates that the defendants, had they chosen to do so, could easily have facilitated the concealment of the leg brace by keeping their pants pulled down, and their legs back from the front of the desk." *Id.* at 7.

On direct appeal, the Arizona Supreme Court rejected Hedlund's claim that the use of the leg brace violated his right to a fair trial:

> In *State v. Boag,* this court commented on the obvious need to leave matters of courtroom security to the discretion of the judge, stating that "absent incontrovertible evidence of [harm to the defendant], the trial court should be permitted to use such means, to secure the named ends [as circumstances require]." 104 Ariz. 362, 366, 453 P.2d 508, 512 (1969). The only evidence of harm Hedlund offers is a third-party, hearsay statement from a defense investigator alleging one juror said she made eye contact with one of the defendants and that it was "eerie." Such an unsubstantiated allegation falls far short of the evidence contemplated in *Boag.*

> When a trial judge's decision to restrain a defendant is supported by the record, this court has upheld that decision, even when the jury views the defendant in restraints. Here, the trial judge specifically made a record to document his security concerns: Hedlund attempted an escape during the summer of 1991 and also made plans with another capital defendant to escape by attacking a guard and taking his uniform and gun. Given the judge's well-founded security concerns and the absence of evidence of specific prejudice to Hedlund, we cannot find that the judge abused his discretion.

*McKinney*, 185 Ariz. at 575-576, 917 P.2d at 1222-23 (citations omitted); *see id.* at 585, 917 P.2d at1232.

Analysis

The Due Process Clause forbids the routine use of physical restraints visible to the jury. *Deck v. Missouri*, 544 U.S. 622, 626 (2005). This is because a "jury's observation of a defendant in custody may under certain circumstances 'create the impression in the minds

- 22 -

of the jury that the defendant is dangerous or untrustworthy' which can unfairly prejudice a defendant's right to a fair trial notwithstanding the validity of his custody status." *United States v. Halliburton*, 870 F.2d 557, 559 (9th Cir. 1989) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986)).

The use of restraints requires a determination by the trial court that the restraints are justified by a specific state interest particular to a defendant's trial. *Deck*, 544 U.S. at 629; *see Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir. 2002) (criminal defendant has a constitutional right to be free of shackles in the presence of the jury absent an essential interest that justifies the physical restraints); *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) (same). Among the security concerns justifying the shackling of a defendant is the risk of escape. *See Deck*, 544 U.S. at 629; *see also Morgan v. Bunnell,* 24 F.3d 49, 51 (9th Cir. 1994); *Hamilton v. Vasquez*, 882 F.2d 1469, 1471-72 (9th Cir. 1989); *Stewart v. Corbin*, 850 F.2d 492, 497 (9th Cir. 1988).

For Petitioner to be entitled to habeas relief, the Court must find that he was physically restrained in the presence of the jury, that the restraints were seen by the jury, and that the restraints were not justified by state interests. *Ghent*, 279 F.3d at 1132; *see Deck*, 544 U.S. at 629. There is no doubt that Petitioner wore a leg brace as a security device throughout his trial, and the record indicates that the brace was visible to the jurors. Therefore, the issue before this Court is whether use of the restraint was justified by a state interest or, if not, whether their use rendered Petitioner's trial unfair. More accurately, the issue is whether, as Petitioner contends, the decision of the Arizona Supreme Court holding that the use of the brace was justified was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts. The Court concludes that it was not.[8]

---

[8] According to Petitioner, this Court must perform an independent, de novo review of this claim because the Arizona Supreme Court incorrectly applied clearly established federal law by requiring Petitioner to show prejudice instead of requiring the State to prove

The cases cited by Petitioner in support of this claim are readily distinguishable. For example, in *Dyas v. Poole*, 317 F.3d 934, 936 (9th Cir. 2003), the only rationale offered by the trial court for visibly shackling the defendant was "that the nature of the case was such that he preferred the defendants to wear leg restraints." In *Rhoden*, 172 F.3d at 636-37, the trial court did not "establish a compelling need" for shackling the defendant, but based its decision on the nature of the charges and the defendant's prior convictions. The defendant "had not engaged in any disruptive behavior and had not expressed an intention to escape or to disrupt trial." *Rhoden v. Rowland*, 10 F.3d 1457, 1459 (9th Cir. 1993). In *Deck*, 544 U.S. at 634, where the defendant was shackled at sentencing, the record "contains no formal or informal findings" supporting the decision to shackle the defendant and the "judge did not refer to a risk of escape. . . . Rather, he gave as his reason for imposing the shackles the fact that Deck already 'has been convicted.'" Finally, in *Williams v. Calderon*, 41 F.Supp. 2d 1043 (C.D. Cal.1998), restraining the defendant at his trial was erroneous because, as the district court noted on habeas review:

> There is no information in the state court record regarding the shackling. There is no indication that the issue was ever discussed by counsel and the trial court. There is no evidence that the trial court ordered petitioner to be shackled. There is no record that defense counsel objected to the shackling. Consequently, the trial court did not articulate its reasons for allowing petitioner to remain shackled and it is unclear whether any less restrictive alternatives were available and would have been adequate.

*Id.* at 1047 (footnote omitted).

In none of these cases did the trial judge make an on-the-record finding that restraints were justified based on evidence of a specific security risk. Judge Sheldon held a hearing and received testimony indicating that Petitioner and Hedlund had discussed an escape attempt. He then made findings that the restraints were necessary and that he had considered

---

that the restraints were justified. Dkt. 42 at 31; Dkt. 59 at 40. The Court disagrees. The decision of the Arizona Supreme Court is based on a determination that the use of the leg braces was justified by security concerns. *McKinney*, 185 Ariz. at 575-76, 917 P.2d at 1222-23.

other alternatives. Hie approval of the use of a leg brace was "case specific" and "reflect[ed] particular concerns, say, special security needs or escape risks, related to the defendant or trial." *Deck*, 544 U.S. at 633; *see Marquard v. Secretary for Dept. of Corrections*, 429 F.3d 1278, 1311 (11th Cir. 2005).

Under clearly established federal law, the evidence elicited before the trial court was sufficient to justify the use of a leg brace to restrain Petitioner at his trial. The Arizona Supreme Court's rejection of this claim was not objectively unreasonable. Claim 4 is denied.

**Claim 5        Trial court's "ex parte" discussion of the case**

Petitioner asserts that his due process rights were violated when Judge Sheldon gave a presentation on the dual jury issue at a judicial conference prior to the Arizona Supreme Court's authorization of the use of dual juries in Petitioner's trial. Dkt. 42 at 32. Petitioner alleges that members of the court were present at the conference. *Id.* Respondents contend that the claim was not presented in state court in a procedurally appropriate manner and is now barred. Dkt. 46 at 64. The Court agrees.

Petitioner did not raise this claim on appeal or during the PCR proceedings, but in a special action petition. In Arizona, a petition for special action is a method for seeking extraordinary judicial relief and is not an adequate substitute for raising a claim on direct appeal or in a petition for review of a denial of post-conviction relief. *See* Ariz. R. Spec. Actions 1 ("[e]xcept as authorized by statute, the special action shall not be available where there is an equally plain, speedy, and adequate remedy by appeal"); *see State ex rel. Romley v. Superior Court*, 198 Ariz. 164, 7 P.3d 970, 972-73 (Ariz. Ct. App. 2000) (acceptance of jurisdiction of a petition for special action is discretionary and appropriate when there is no equally plain, speedy or adequate remedy available by appeal, or when the case presents a narrow question of law of statewide importance). "Submitting a new claim to the state's highest court in a procedural context in which its merits will not be considered absent special circumstances does not constitute fair presentation." *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994); *see Moreno v. Gonzalez*, 116 F.3d 409, 410 n.1 (9th Cir. 1997); *Burns v. McFadden*, 34 F. App'x 263, 265 (9th Cir. 2002) (raising an issue in an Arizona special

action does not exhaust the claim for federal habeas purposes); *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (raising a claim in a procedural context in which the merits would not be considered absent special and important reasons does not constitute fair presentation for purposes of exhaustion).

The claim is procedurally defaulted. Petitioner has not established cause and prejudice to excuse the default, nor has he alleged that a fundamental miscarriage of justice will occur if the claim is not considered. Therefore the claim is procedurally barred.

The claim is also plainly meritless. Petitioner cites no clearly established federal law holding that a defendant's due process rights are violated when the trial judge discusses legal issues from the case at a professional gathering.[9] Presumably, Petitioner's argument is that Judge Sheldon's presentation to the conference somehow reified his decision to impanel a dual jury or influenced the state supreme court in their ruling affirming the judge's decision. This argument fails because, as described above, the use of a dual jury did not violate Petitioner's due process rights. Claim 5 is denied.

**Claim 6          Victim impact statements**

Petitioner alleges that his due process and Eighth Amendment rights were violated when the trial judge read and considered letters written by McClain's family urging the judge to reject a plea agreement in Hedlund's case. Dkt. 42 at 33. Respondents contend that the claim was never presented in state court and is procedurally barred, Dkt. 46 at 67, while Petitioner argues that he presented the claim in a special action to Arizona Supreme Court, Dkt. 46 at 46.

Assuming Petitioner did raise this issue in a special action, that would not, for the reasons set forth above, constitute "fair presentation." Therefore, this claim is procedurally

---

[9] Petitioner's assertion that Judge Sheldon violated the Arizona Code of Judicial Conduct does not state a federal claim. *Cf. Moffat v. Gilmore*, 113 F.3d 698, 702 (7th Cir. 1997) (habeas petitioner failed to present federal claim of due process where he raised the issue of allegedly ex parte communication on direct appeal and collateral attack in state court, but did so only in terms of canons of judicial ethics and of state law, not federal law).

defaulted. Petitioner has not established cause and prejudice regarding his procedural default of this claim, nor has he alleged that a fundamental miscarriage of justice will occur if the claim is not considered. The claim is procedurally barred.

Additionally, Claim 6 may be denied on the merits. To the extent he cites clearly established federal law in support of the claim, Petitioner relies on *Booth v. Maryland*, 482 U.S. 496 (1987), and *Payne v. Tennessee*, 501 U.S. 808 (1991). These cases specifically address the admissibility of victim impact evidence at a capital sentencing, prohibiting certain information on the grounds that it would lead a jury to impose a death sentence in an arbitrary and capricious manner.[10] *Booth*, 482 at 502-03. The holdings in *Booth* and *Payne* have no bearing on the issue presented here – the trial judge's receipt of victim impact information in the context of a proposed plea agreement prior to trial. Moreover, there is no suggestion that the court improperly considered the information in sentencing Petitioner. This claim is not supported by clearly established federal law.

Claim 6 is denied as procedurally barred and meritless.

**Claim 7        Actual innocence**

Petitioner alleges that he is "actually innocent" of the first degree murders. Dkt. 42 at 33-34. He did not raise the claim in state court, and Respondents contend that it is procedurally barred. Dkt. 46 at 69.

Petitioner appears to raise a freestanding claim of "actual innocence." The United States Supreme Court has never held that such a claim provides a ground for habeas relief. *See Herrera v. Collins*, 506 U.S. 390 (1993) (leaving open the question whether execution of an innocent person would violate the Eighth Amendment absent an independent constitutional violation occurring in the state trial); *House v. Bell*, 547 U.S. 518 (2006) (again

---

[10]   In *Booth v. Maryland*, 482 U.S. 496 (1987), the Supreme Court held that the admission of victim impact testimony at a capital sentencing constituted a per se Eighth Amendment violation. *Payne v. Tennessee*, 501 U.S. 808, 830 n.2 (1991), reversed that holding, but left in place the prohibition on opinions from family members about the crime, the defendant, and the appropriate sentence.

declining to resolve whether federal courts may entertain claims of actual innocence). The Court has indicated, however, that the threshold for a cognizable freestanding innocence claim would be "extraordinarily high." *Herrera*, 506 U.S. at 417. The Court elaborated on this theoretical standard in *House*:

> We conclude here, much as in *Herrera,* that whatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it. To be sure, House has cast considerable doubt on his guilt – doubt sufficient to satisfy *Schlup*'s gateway standard for obtaining federal review despite a state procedural default. In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as "extraordinarily high." . . . *Herrera* requires more convincing proof of innocence than *Schlup*. It follows, given the closeness of the *Schlup* question here, that House's showing falls short of the threshold implied in *Herrera.*

547 U.S. at 555.

In *Schlup v. Delo*, 513 U.S. 298 (1995), the Court, discussing the miscarriage-of-justice "gateway" exception to procedural default, held that a petitioner claiming actual innocence must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." 513 U.S. at 327. The petitioner must prove with "new reliable evidence" that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 324, 327.

Here, Petitioner's new evidence, consisting of notes from the police investigation, *see* Dkt. 43, is of no apparent exculpatory value and falls far short of meeting either the *Schlup* or *Herrera* standard for a claim of actual innocence. Claim 7 will be denied.[11]

**Claim 8          Expert witness status**

Petitioner contends that his right to due process and a fair trial was violated by the trial court's practice of "conferring" expert status on the State's witnesses. Dkt. 42 at 43. The

---

[11] To the extent that Petitioner alleges that his convictions were not supported by sufficient evidence under *Jackson v. Virginia*, 443 U.S. 307 (1999), the claim is procedurally barred and meritless. The Court rejects the argument that the procedural default of the claim is excused by ineffective assistance of appellate or PCR counsel, and the evidence presented at trial, when viewed in a light most favorable to the prosecution, was sufficient to allow a rational juror to find Petitioner guilty.

claim refers to the prosecutor's practice of submitting certain witnesses as experts in their fields; after laying a foundation for the witness's expertise, the prosecutor stated that he "submitted" the witness as an expert. Defense counsel did not object when this occurred, and the court made no comment beyond telling the prosecutor that he "may proceed." *See, e.g.*, RT 11/3/92 at 25.

Although Petitioner challenged this process on direct appeal, Opening Br. at 12, Respondents contend that his passing reference to a due process violation under the state and federal constitutions did not suffice to fairly present the claim's federal basis. Dkt. 46 at 73. Regardless of the claim's procedural status, Petitioner is not entitled to relief.

On direct appeal, the Arizona Supreme Court expressed disapproval for the process of "submitting" expert witnesses, but held that their testimony was properly admitted and concluded that "the issue falls far short of fundamental error." *McKinney*, 185 Ariz. at 586, 917 P.2d at 1233. This ruling was neither contrary to nor an unreasonable application of clearly established federal law.

For habeas review of this claim, the standard is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (citations and quotations omitted). Petitioner is entitled to relief only if the trial court's actions "made [the] trial so fundamentally unfair as to deny [him] due process" based on the "totality of the circumstances." *Id.* at 645; *see Estelle v. McGuire*, 502 U.S. at 67-68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.") (internal quotation omitted)).

The totality of the circumstances in Petitioner's case includes, along with the prosecutor's practice of submitting the witnesses as experts, the trial judge's lack of comment on the witness's status and this instructions to the jury:

> a witness may testify as to an opinion on a subject upon which the witness has become an expert because of education, study, or experience. You should consider the opinion of an expert and you should weigh the reasons, if any, given for it. However, you are not bound by any expert opinion. You should give the expert opinion the weight that you believe it deserves.

RT 11/9/92 at 124.

Given this directive and other instructions on the jury's role in evaluating testimony, RT 11/9/92 at 114, 116-17, the irregularities with which the expert testimony was introduced did not affect the fundamental fairness of Petitioner's trial. Petitioner does not contest that the witnesses were experts by virtue of their experience and training and that their testimony was admissible. *See United States v. Johnson*, 488 F.3d 690, 697-98 (6th Cir. 2007) (no plain error where the court "declared" that a witness was an expert where no objection was made and the witness was qualified to so testify). The jurors were not misled about the weight of the testimony or their role in evaluating it. Claim 8 is denied.

**Claim 9      Failure to consider mitigating evidence**

Petitioner contends that the trial court failed to "properly consider" mitigating evidence concerning his childhood, substance abuse, and level of participation in the offense, thereby violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Dkt. 42 at 44-45. The Court finds that this claim was exhausted by the Arizona Supreme Court's independent review of Petitioner's death sentence. *See Moormann*, 426 F.3d at 1057; *State v. Gretzler*, 135 Ariz. 42, 54, 659 P.2d 1, 13 (1983); *see also* Claim 17 below.

<u>Background</u>

Defense counsel filed a sentencing memorandum asserting eleven mitigating factors, along with a psychological report prepared by Dr. Mickey McMahon, a clinical psychologist. ROA 114. The trial court held a three-day presentence hearing. Petitioner presented testimony from family members and Dr. McMahon. Diana McKinney, Petitioner's sister, and his aunt, Susan Sesate, described in detail the neglect and abuse, both emotional and physical, Petitioner and his siblings experienced at the hands of their stepmother. RT 7/16/93. Their father abused alcohol and was often absent. *Id.* at 24. Petitioner was regularly beaten by his stepmother. *Id.* at 24, 27, 31, 39, 41, 48, 73. The children's room,

which they shared with a number of animals, was filthy with waste. *Id.* at 21-22, 59, 64, 66. At a young age the children were forced to do their own cooking and cleaning. *Id.* at 23-26. When they failed in these duties they were locked outside the house. *Id.* at 25, 32, 71. They often went hungry, and their clothes were dirty and ill-fitting. *Id.* at 28. Petitioner was ridiculed at school due to his bedraggled condition. *Id.* at 28-29, 68. He grew withdrawn and by age nine or ten had become a loner and would not play with other children. *Id.* at 34, 36.

In his report and testimony at the presentence hearing, Dr. McMahon opined that Petitioner suffered from post-traumatic stress disorder ("PTSD") resulting from the abuse he experienced and witnessed as a child. RT 7/16/93 at 123, 131. The results of a personality test further indicated that Petitioner was shy and submissive, a follower who was unlikely to take risks. *Id.* at 118. He was susceptible to being "emotionally overwhelmed" by stressful situations, which would cause him to "act in poorly judged ways." *Id.* Tests showed that Petitioner's I.Q. was 85, in the "low-average" range. There was evidence of a learning disability, but not "significant neurological dysfunction." *Id.* at 117; *see id.* at 120. Petitioner began using alcohol and marijuana at the age thirteen to relieve the stress and emotional pain of his home-life. *Id.* at 124. Based upon this information, Dr. McMahon posited that PTSD caused Petitioner to react with violence during the Mertens burglary. He may have been confronted by Ms. Mertens, which acted as a trigger to the shooting. *Id.* at 140. Dr. McMahon further testified that Petitioner would not be an escape risk or pose a threat of violence when incarcerated. *Id.* at 121.

Judge Sheldon in his special verdict indicated that he had considered all of the evidence and testimony. RT 7/23/93 at 26. With respect to Petitioner's childhood, the judge accepted as truthful the testimony of Petitioner's family members and concluded that Petitioner had "at the very least . . . a traumatic childhood" and that the "circumstances that he grew up in . . . were extraordinary" and "beyond the comprehension and understanding of most people." *Id.*

Concerning Petitioner's psychological status, Judge Sheldon accepted Dr. McMahon's diagnosis of PTSD caused by Petitioner's abusive childhood. *Id.* at 28; *see* RT 7/20/93 at 18. The judge determined, however, based on Dr. McMahon's testimony and trial evidence showing that Petitioner's crimes involved "thoughtful, reflective planning" and attempts at concealment, that PTSD did not "in any way significantly impair[] Mr. McKinney's conduct" as required under A.R.S. § 13-703(G)(1). *Id.* at 28. The judge further noted that Petitioner's role in the string of burglaries and the two murders was inconsistent with the diagnosis offered by Dr. McMahon which suggested that Petitioner was a follower who would avoid risky or stressful situations. *Id.* at 29-30.

The court also considered the nonstatutory mitigating circumstances offered by Petitioner and found that Petitioner's traumatic childhood, in combination with other factors including substance abuse and cognitive impairment, constituted a "substantial mitigating factor." *Id.* at 31-32. The court then concluded:

> With respect to the other matters set out in the [sentencing] memorandum, I have considered them at length, and after considering all of the mitigating circumstances, the mitigating evidence that was presented by the defense in this case as against the aggravating circumstances, and other matters which clearly are not set forth in the statute which should be considered by a court, I have determined that given the pre-planning, the methodicalness of the offenses that occurred here, the senselessness of the violence of the killings, that the aggravating circumstances which have been proven beyond a reasonable doubt . . . that the mitigating circumstances simply are not sufficiently substantial to call for leniency under all of the facts of this case.

*Id.* at 32.

On appeal, the Arizona Supreme Court rejected Petitioner's claim "that executing him would be cruel and unusual punishment because his childhood abuse caused him to commit murder." *McKinney*, 185 Ariz. at 587, 917 P.2d at 1234. The Supreme Court conducted an independent review of Petitioner's sentence and explained:

> McKinney offered evidence from several witnesses that he . . . endured a terrible childhood. The judge found as a fact that McKinney had an abusive childhood.
>
> Here again, the record shows that the judge gave full consideration to

McKinney's childhood and the expert testimony regarding the effects of that childhood, specifically the diagnosis of post-traumatic stress disorder (PTSD). Assuming the diagnoses were correct, the judge found that none of the experts testified to, and none of the evidence showed, that such conditions in any way significantly impaired McKinney's ability to conform his conduct to the law. The judge noted that McKinney was competent enough to have engaged in extensive and detailed pre-planning of the crimes. McKinney's expert testified that persons with PTSD tended to avoid engaging in stressful situations, such as these burglaries and murders, which are likely to trigger symptoms of the syndrome. The judge observed that McKinney's conduct in engaging in the crimes was counter to the behavior McKinney's expert described as expected for people with PTSD. As we noted in discussing Hedlund's claim on this same issue, a difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted the defendant's ability to perceive, comprehend, or control his actions.

The record clearly shows that the judge considered McKinney's abusive childhood and its impact on his behavior and ability to conform his conduct and found it insufficiently mitigating to call for leniency. On this record there was no error.

*Id.* (citations omitted).

<u>Analysis</u>

A sentencing court is required to consider any mitigating information offered by a defendant, including non-statutory mitigation. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996). In *Lockett* and *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982), the Supreme Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. Constitutionally relevant mitigating evidence is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604; *see Skipper v. South Carolina*, 476 U.S. 1, 5 (1986). While the sentencer must not be foreclosed from considering relevant mitigation, "it is free to assess how much weight to assign such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings*, 455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be given the relevant mitigating evidence."); *see also State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (mitigating evidence must be considered regardless of whether there

is a "nexus" between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence).

On habeas review, a federal court does not evaluate the substance of each piece of evidence submitted as mitigation. Instead, it reviews the record to ensure the state court allowed and considered all relevant mitigation. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (when it is evident that all mitigating evidence was considered, the trial court is not required to discuss each piece of evidence); *see also Lopez v. Schriro*, 491 F.3d 1029, 1037 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 1227 (2008) (rejecting a claim that the sentencing court failed to consider proffered mitigation where the court did not prevent the defendant from presenting any evidence in mitigation, did not affirmatively indicate there was any evidence it would not consider, and expressly stated it had considered all mitigation evidence proffered by the defendant).

It is clear from the record that the trial court and the Arizona Supreme Court in its independent review of the sentence considered the mitigation evidence presented by Petitioner's witnesses. The state courts accepted that Petitioner's abusive childhood constituted a mitigating factor. They also discussed and evaluated the full scope of Dr. McMahon's testimony. There is simply no indication that either court refused to consider the mitigating evidence Dr. McMahon provided with respect to Petitioner's traumatic childhood and PTSD. The fact that the courts noted weaknesses and inconsistencies in the evidence, and took these deficiencies into account when weighing the mitigating information, does not amount to a constitutional violation. *See Eddings*, 455 U.S. at 114-15; *Ortiz*, 149 F.3d at 943.

Petitioner contends that the state courts erroneously applied a causal nexus requirement to the mitigating information, requiring Petitioner to show a connection between the proffered evidence and the murders. Dkt. 71 at 81-85; Dkt. 91 at 64-66. The Court disagrees.

In *Tennard v. Dretke*, 542 U.S. 274, 289 (2004), the Supreme Court held that the habeas petitioner was entitled to a certificate of appealability on his claim that Texas's capital

sentencing scheme failed to provide a constitutionally adequate opportunity to present his low I.Q. as a mitigating factor. 542 U.S. at 289. The Court rejected the "screening" test applied by the Fifth Circuit, according to which mitigating information is constitutionally relevant only if it shows "uniquely severe" circumstances to which the criminal act was attributable. *Id.* at 283-84. Instead, the Court explained, the test for the relevance of mitigation evidence is the same standard applied to evidence proffered in other contexts – whether the evidence has any tendency to make the existence of any fact that is of consequence to a determination of the action more or less likely than it would be without the evidence. *Id.* at 284. The Court held that evidence of impaired intellectual functioning is inherently mitigating at the penalty phase of a capital case, regardless of whether the defendant has established a nexus between the mental incapacity and the crime. *Id.* at 287.

The courts in Petitioner's case did not impose a relevancy test or any other barrier to consideration of the proffered mitigation. To the contrary, the trial court and the Arizona Supreme Court explicitly considered the evidence of Petitioner's traumatic childhood and substance abuse, and the trial court accepted as true the allegations regarding Petitioner's abusive childhood. The courts accepted Dr. McMahon's diagnosis of PTSD. The fact that the courts perceived the lack of a relationship between the mitigating evidence and Petitioner's criminal conduct and therefore assigned less weight to the evidence than Petitioner believes was warranted does not constitute a constitutional violation. *See Eddings*, 455 U.S. at 114-15; *Ortiz*, 149 F.3d at 943.

Petitioner is not entitled to relief on Claim 9.

**Claim 11      Ineffective assistance of counsel at sentencing**

Petitioner contends that counsel conducted an inadequate investigation into mitigating information. Dkt. 42 at 64. He faults counsel for not seeking the appointment of a mitigation specialist and asserts, without elaboration, that counsel "did not provide sufficient information in the mitigation phase." *Id.* at 65.

<u>Background</u>

In his PCR petition, Petitioner claimed that counsel had performed ineffectively at sentencing by failing to "investigate and substantiate" the relationship between violent adult behavior and PTSD, child abuse, and brain injury. Dkt. 47, Ex. B at 31. Specifically, he faulted counsel for not investigating the possibility that Petitioner had experienced incidents of traumatic brain injury as a child. *Id.* at 32.

The PCR court, citing *Strickland v. Washington*, 466 U.S. 668 (1984), rejected the allegation:

> Counsel also diligently and aggressively represented the Defendant at sentencing. Although Defendant raises several issues with respect to counsel's performance at sentencing, Defendant has failed to raise any reasonable probability that, even assuming there were errors, that [sic] the sentence would have been different. However, Defendant must establish *both* that counsel performed incompetently during sentencing and that that deficient performance resulted in prejudice. There was substantial mental health evidence presented to the sentencing court and the defense, in this Petition for Post-Conviction Relief, has not presented anything that this Court believes would have demonstrated that either Defense counsel were ineffective in failing to consider it or presenting it at the time of sentencing, or that any such evidence would have caused the result to be any different.

ME 5/31/01 at 12-13.

<u>Analysis</u>

For claims alleging ineffective assistance of counsel, the clearly established federal law is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id*. at 687-88. Review of counsel's performance under *Strickland* is "extremely limited." *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir.1998), *judgment rev'd on other grounds*, 525 U.S. 141 (1998). "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.*

The right to effective assistance of counsel applies not just to the guilt phase, but "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)). In assessing whether counsel's performance was deficient under *Strickland*, the test is whether counsel's actions were objectively reasonable at the time of the decision. *Strickland*, 466 U.S. at 689-90. The question is "not whether another lawyer, with the benefit of hindsight, would have acted differently, but 'whether counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Strickland*, 466 U.S. at 687).

With respect to prejudice at sentencing, *Strickland* explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695. In *Wiggins v. Smith*, 539 U.S. 510, 534 (2003), the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." The totality of the available evidence includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-98).

The clearly-established federal law governing this claim includes the Supreme Court's decision in *Bell v. Cone*, 535 U.S. 685 (2002), which clarifies the standard this Court must apply in reviewing the PCR court's rejection of Petitioner's sentencing-stage ineffective assistance claim. In *Cone*, the Supreme Court, after noting the deferential standards set forth in the AEDPA and required by its own precedent, explained that for a habeas petitioner's ineffective assistance claim to succeed:

> he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that [the state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Id.* at 698-99 (citation omitted).

Judge Sheldon, who presided over Petitioner's trial and sentencing, also presided over the PCR proceedings. In considering Petitioner's ineffective assistance claims, the judge was already familiar with the record and the evidence presented at trial and sentencing. The judge's familiarity with the record provides this Court with an additional reason to extend deference to the PCR court's ruling. *See Smith v. Stewart*, 140 F.3d 1263, 1271 (9th Cir. 1998). As the Ninth Circuit explained in *Smith*, when the judge who governed the post-conviction proceeding is the same as the trial and sentencing judge, the court is considerably less inclined to order relief. Doing so "might at least approach 'a looking-glass exercise in folly.'" *Id.* (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir. 1997)).

Petitioner has shown neither deficient performance nor prejudice. He does not offer a single allegation that defense counsel omitted any specific, relevant mitigating information at sentencing. Petitioner does not, for instance, suggest the existence of organic brain injury or any other condition that was undiscovered by sentencing counsel or Dr. McMahon, nor does he allege that further information about his traumatic childhood could have been presented. Conclusory allegations of deficient performance with no reference to the record or other evidence are insufficient and do not entitle Petitioner to habeas relief. *See Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (citing *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)). Petitioner falls far short of showing that Judge Sheldon's rejection of this claim was objectively unreasonable. Claim 11 is denied.

**Claim 17      Pecuniary gain aggravating factor**

Petitioner contends that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the state courts found that he committed the offense in expectation of something of pecuniary value, in satisfaction of the aggravating factor set forth in A.R.S. § 13-703(F)(5). Dkt. 42 at 71. Petitioner did not raise this claim on direct appeal. He raised the claim in his PCR petition, but the court did not address it. Dkt. 47, Ex. B at 6, Ex. C. Respondents contend that the claim is procedurally barred. Dkt. 46 at 99. The Court disagrees.

The Arizona Supreme Court independently reviews each capital case to determine whether the death sentence is appropriate. In *Gretzler*, 135 Ariz. at 54, 659 P.2d at 13, the court stated that the purpose of independent review is to assess the presence or absence of aggravating and mitigating circumstances and the weight to assign each. To ensure compliance with Arizona's death penalty statute, the court reviews the record regarding aggravation and mitigation findings and decides independently whether the death sentence should be imposed. *State v. Brewer*, 170 Ariz. 486, 493-94, 826 P.2d 783, 790-91 (1992). The Arizona Supreme Court has also stated that in conducting its review, it determines whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factors. *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *sentence overturned on other grounds, Richmond v. Cardwell,* 450 F.Supp. 519 (D.Ariz. 1978). Arguably, such a review rests on both state and federal grounds. *See Brewer,* 170 Ariz. at 493, 826 P.2d at 790 (finding that statutory duty to review death sentences arises from need to ensure compliance with constitutional safeguards imposed by the Eighth and Fourteenth amendments).

While the state court's independent review does not encompass any and all alleged constitutional errors at sentencing, the Court must determine if it encompassed Petitioner's claim that the trial court erred in finding the pecuniary gain aggravating factor. In Petitioner's case, the Arizona Supreme Court "conduct[ed] a thorough review of the record and of the aggravating and mitigating evidence to determine whether the [death] sentence is warranted." *McKinney*, 185 Ariz. at 578, 917 P.2d at 1225. With respect to Hedlund's challenge to the trial court's application of the pecuniary gain factor, the state supreme court reviewed the evidence in the record and determined that the factor had been satisfied. *Id.* at 583-84, 917 P.2d at 1230-31. This review sufficiently exhausted Claim 17.

Analysis

The trial court cited a number of factors in support of its conclusion that the State had proved the pecuniary gain factor. With respect to the Mertens murder, the court noted that prior to and during the crime spree Petitioner had discussed with Hedlund and others his need

for money. RT 7/23/93 at 14-15. They discussed Mertens as a burglary target, having been informed that she kept cash in her residence. *Id.* at 15-16. Petitioner and the others noted the location of the residence and drove by the house several times. *Id.* During the burglary the home was ransacked. Money and jewelry were missing, and physical evidence linked Petitioner to the scene. *Id.* at 16-17. Petitioner also participated in other burglaries before and after burglarizing Mertens. *Id.* at 15. During the discussions about the burglaries, Petitioner stated that if necessary to conceal his involvement he would shoot the resident of the burglarized home. *Id.* at 17. The court next discussed the evidentiary support for the pecuniary gain factor with respect to the McClain murder, noting that Petitioner and Hedlund sold the firearms taken from the residence and attempted to conceal other stolen items, including McClain's car and wallet. *Id.* at 19-21.

> The Arizona Supreme Court agreed with the trial judge's analysis of this factor:
>
> Simply receiving profit as the result of a murder is not enough to satisfy the requirements of § 13-703(F)(5), but killing for the purpose of financial gain is sufficient. Both of these murders were committed in the course of an ongoing burglary spree. The purpose of the burglaries was to find cash or property to fence. Items stolen from the McClain residence were in fact sold. Clearly, the evidence of pecuniary gain as the primary, if not sole, purpose of the murders is overwhelming and inescapable. Thus, we affirm the finding that Hedlund murdered for pecuniary gain.

*McKinney*, 185 Ariz. at 583-84, 917 P.2d at 1230-31 (citation omitted).

Habeas review "is limited, at most, to determining whether the state court's finding was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). The reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the factor had been satisfied." *Id.* at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

"[A] finding that a murder was motivated by pecuniary gain for purposes of § 13-703(F)(5) must be supported by evidence that the pecuniary gain was the impetus of the murder, not merely the result of the murder." *Moormann*, 426 F.3d at 1054. Based upon the facts proven at the trial, a rational factfinder could have determined that the murders were

committed in the expectation of pecuniary gain. *See Correll v. Stewart*, 137 F.3d 1404, 1420 (9th Cir. 1998); *Woratzeck v. Stewart*, 97 F.3d 329, 336 (9th Cir. 1996).

Viewed in the light most favorable to the State, the evidence showed that Petitioner, in order to alleviate his financial difficulties, participated in a series of burglaries, taking cash and valuables from several residences, including the homes of the murder victims. The evidence also showed that in order to successfully carry out the burglaries Petitioner intended to shoot any resident he encountered. Pecuniary gain was the impetus of the killings. Mertens and McClain were killed to facilitate and conceal the taking of their property. "Murdering a person to facilitate a robbery and escape constitutes murdering for pecuniary gain." *State v. Mann*, 188 Ariz. 220, 227, 934 P.2d 784, 791 (1997). There is no evidence of a motive for the murder other than the expectation of pecuniary gain. *Compare State v. LaGrand*, 153 Ariz. 21, 35, 734 P.2d 563, 577 (1987) ("When the defendant comes to rob, the defendant expects pecuniary gain and this desire infects all other conduct of the defendant.") *with State v. Wallace*, 151 Ariz. 362, 368, 728 P.2d 232, 238 (1986) (insufficient evidence to support pecuniary gain aggravating factor where defendant's motive was relationship difficulties with the victim and the taking of money and keys was incidental to the murder). Here, because the burglaries "permeated [Petitioner's] entire conduct," *LaGrand*, 153 Ariz. at 36, 734 P.2d at 578, the state courts correctly determined that the pecuniary gain factor was established.

Petitioner is not entitled to relief on Claim 17.

**Claim 18**        *Ring* **violation**

Petitioner contends that he was entitled to be sentenced by a jury under *Ring v. Arizona*, 536 U.S. 584, 609 (2002). Dkt. 42 at 73. In *Ring*, the Supreme Court held that Arizona's aggravating factors are an element of the offense of capital murder and therefore must be found by a jury. In *Schriro v. Summerlin*, 542 U.S. 348 (2004), however, the Court held that *Ring* does not apply retroactively to cases already final on direct review. Because direct review of Petitioner's case was final prior to *Ring*, he is not entitled to federal habeas relief. Claim 18 is denied.

**Claims 19, 20    Arizona death penalty statute**

Petitioner contends that Arizona's death penalty statute does not sufficiently channel the sentencer's discretion. Dkt. 42 at 75. He also argues that the "mandatory" nature of Arizona's death penalty improperly limits the sentencer's discretion. *Id.* at 78. The Arizona Supreme Court rejected these contentions on direct appeal, *McKinney*, 185 Ariz. at 578, 917 P.2d at 1225, and they are without merit.

Rulings of both the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors do not adequately narrow the sentencer's discretion. *See Jeffers*, 497 U.S. at 774-77; *Walton v. Arizona*, 497 U.S. 639, 649-56 (1990); *Woratzeck*, 97 F.3d at 335. The Ninth Circuit has also explicitly rejected the contention that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith*, 140 F.3d at 1272.

In *Walton*, the Supreme Court rejected the argument that "Arizona's allocation of the burdens of proof in a capital sentencing proceeding violates the Constitution." 497 U.S. at 651. *Walton* also rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty because it provides that the death penalty "shall" be imposed if one or more aggravating factors are found and mitigating circumstances are insufficient to call for leniency. *Id.* at 651-52 (citing *Blystone v. Pennsylvania*, 494 U.S. 299 (1990), and *Boyde v. California*, 494 U.S. 370 (1990)); *see Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006) (relying on *Walton* to uphold Kansas's death penalty statute, which directs imposition of the death penalty when the state has proved that mitigating factors do not outweigh aggravators); *Smith*, 140 F.3d at 1272 (summarily rejecting challenges to the "mandatory" quality of Arizona's death penalty statute and its failure to apply the beyond-a-reasonable-doubt standard). Claims 19 and 20 are denied.

**Claims 21, 22        Death penalty/lethal injection**

Claim 21 alleges that the death penalty violates the Eighth Amendment. Dkt. 42 at 81. Claim 22 alleges that Arizona's protocol for execution by lethal injection violates the

Eighth Amendment. *Id.* at 82. These claims are meritless. The United States Supreme Court has never held that the death penalty in general or lethal injection specifically constitutes cruel and unusual punishment. *See Baze v. Rees*, 128 S. Ct. 1520 (2008). The Ninth Circuit has concluded that death by lethal injection in Arizona does not violate the Eighth Amendment. *See LaGrand v. Stewart*, 133 F.3d 1253, 1265 (9th Cir. 1998); *Poland v. Stewart*, 117 F.3d 1094, 1104-05 (9th Cir. 1997). The Arizona Supreme Court's rejection of these claims, *McKinney*, 185 Ariz. at 578, 917 P.2d at 1225, was neither contrary to nor an unreasonable application of clearly established federal law. Claims 21 and 22 are denied.

**Claim 23     Cumulative error**

Petitioner contends that the cumulative effect of the errors in his trial mandate a reversal of his conviction and sentence. Dkt. 42 at 85.

Respondents contend that the claim was never presented in state court and therefore is unexhausted and procedurally defaulted. Dkt. 46 at 114. Petitioner counters that he exhausted the claim by identifying in state court the individual errors that occurred during his trial, thereby affording the courts an opportunity to consider his claim of cumulative error. Dkt. 59 at 96. The Court disagrees and concludes that Petitioner failed to present his cumulative error claim in state court. *See, e.g.*, *Jimenez v. Walker*, 458 F.3d 130, 148-49 (2d Cir. 2006) (cumulative error claim not properly exhausted).

Alternatively, Petitioner cites as cause for the default ineffective assistance of appellate and PCR counsel. Dkt. 59 at 96. Before ineffectiveness may be used to establish cause for a procedural default, it must have been presented to the state court as an independent claim. *See Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000) ("ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"); *Murray*, 477 U.S. at 489-90 ("the exhaustion doctrine . . . generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default"). Petitioner never presented  a claim of ineffective assistance based on appellate counsel's failure to raise an allegation of cumulative error.  Because he is now precluded by

Rules 32.2(a)(3) and 32.4 from presenting this claim in state court, he cannot establish ineffective assistance on appeal as cause for the default of Claim 23.  Moreover, because there is no right to effective post-conviction counsel, *see Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Murray v. Giarratano*, 492 U.S. 1, 7-12 (1989), ineffective assistance of PCR counsel cannot constitute cause for the default.

Claim 23 is procedurally barred and will be dismissed with prejudice.

**Claim 24**     *Lackey*

Petitioner contends that his execution after more than ten years on death row would serve no legitimate penological purpose and therefore would violate the Eighth Amendment. Dkt. 42 at 86.  This claim is meritless.  The United States Supreme Court has not held that lengthy incarceration prior to execution constitutes cruel and unusual punishment.  *See Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim has not been addressed); *Thompson v. McNeil*, 129 S. Ct. 1299 (2009) (mem.) (Stevens, J. & Breyer, J., dissenting from denial of certiorari; Thomas, J, concurring, discussing *Lackey* issue). Circuit courts, including the Ninth Circuit, have held that prolonged incarceration under a sentence of death does not offend the Eighth Amendment.  *See McKenzie v. Day*, 57 F.3d 1493, 1493-94 (9th Cir. 1995) (en banc); *White v. Johnson*, 79 F.3d 432, 438 (5th Cir. 1996); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995).  Accordingly, Petitioner cannot establish a right to federal habeas relief.  *See Allen v. Ornoski*, 435 F.3d 946, 958-60 (9th Cir. 2006).  Claim 24 is denied.

**Claim 25     Unfair clemency process**

Petitioner asserts that he is being denied a fair clemency process.  Dkt. 42 at 89. Petitioner acknowledges that because he has not sought clemency this claim is premature and not ripe for adjudication.  More significantly, however, this claim is not cognizable on federal habeas review.  Habeas relief can only be granted on a claim that a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner's challenge to state clemency procedures does not constitute an attack on his detention and thus is not a proper ground for habeas relief.  *See Franzen v. Brinkman*, 877

F.2d 26 (9th Cir. 1989); *see also Woratzeck v. Stewart*, 118 F.3d 648, 653 (9th Cir. 1997) (per curiam) (clemency claims are not cognizable under federal habeas law). Claim 25 is dismissed as not cognizable.

**Claim 26      Incompetence to be executed**

Petitioner contends, citing *Ford v. Wainwright*, 477 U.S. 399 (1986), that he is incompetent to be executed. Dkt. 42 at 91. This claim is not yet ripe for federal review. Under *Martinez-Villareal v. Stewart*, 118 F.3d 628, 634 (9th Cir. 1997), *aff'd*, 523 U.S. 637 (1998), a claim of incompetency for execution had to "be raised in a first habeas petition, whereupon it also must be dismissed as premature due to the automatic stay that issues when a first petition is filed." The Supreme Court revisited *Martinez-Villareal* and concluded in *Panetti v. Quarterman*, 127 S. Ct. 2842 (2007), that it is unnecessary to raise unripe *Ford* claims in the initial habeas petition in order to preserve any possible unripe incompetency claim. *Id.* at 2854. Thus, if this claim becomes ripe for review, it may be presented to the district court; it will not be treated as a second or successive petition. *See id*. at 2854-55. Claim 26 is dismissed without prejudice as premature.

## CONCLUSION

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce resources that might be consumed drafting and reviewing an application for a certificate of appealability ("COA") to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C.

§ 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claims 1 and 4. For the reasons stated in this Order, and in the Court's Order of January 1, 2006, Dkt. 66, the Court declines to issue a COA with respect to any other claims.

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus, Dkt. 42, is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on April 28, 2003, Dkt. 2, is **VACATED.**

**IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the following issues:

Whether Claim 1 of the Amended Petition – alleging that Petitioner's rights were violated by the use of dual juries – is without merit.

Whether Claim 4 of the Amended Petition – alleging that Petitioner's rights were violated by the use of a leg brace at his trial – is without merit.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 10th day of August, 2009.

_____
David G. Campbell
United States District Judge